## Case No. 1,330.

### BENTALOE v. PRATT.

[Wall. Sr. 58.] [1]

Circuit Court, E. D. Pennsylvania. May 19, 1801.

MARINE INSURANCE—RECOVERY OF AVERAGE LOSS—EVIDENCE—DEVIATION—USAGE.

1. In certain circumstances it is not necessary, in order to recover an average loss, that the plaintiff should produce the invoice, or prove the prime cost of the goods damaged.

2. It is no deviation, to touch and stay at a port out of the course of the voyage if such departure is within the usage of the trade; but whether the deviation, in point of time, or object, or cause, is within the established usage, is matter of fact, and if proved that the deviation was not within the purposes, and for the objects, authorized by the usage, the insured cannot recover.

[Cited in Hostetter v. Gray, 11 Fed. 181; Hostetter v. Park, 137 U. S. 40, 11 Sup. Ct. 4.]

[3. In an action to recover for an average loss for damage by the sea to goods insured, a survey made by the captain at the port of delivery is not an essential piece of evidence to make out the title of the insured to his indemnity, if he could satisfactorily prove the damage without it.]

This was an action on a policy of insurance on goods in the sloop Polly, from the lading at Providence, in Rhode Island, to the unlading at Baltimore, in Maryland. The goods were valued at £3750 in the policy; the whole subscription was 8000 dollars, of which the defendant had subscribed £100: and the action was to recover an average loss on account of fifteen bales of cotton, (being part of twenty-one bales shipped at Providence) alleged to be wet through, and damaged on the voyage by the sea, winds and weather, &c. [Verdict for plaintiff.]

The following points arose in the course of the trial.

1st. The plaintiff in order to prove the average loss on the fifteen bales, gave in evidence, that the whole fifteen, if undamaged would have sold at Baltimore for dollars 6975 02, but in their damaged condition sold for dollars 4545 70, making a loss of dollars 2429 32.

Rawle, in summing up to the jury, objected that the plaintiff ought to have shown the invoice value, or prime cost of the bales at the port of lading, and then by showing what a sound bale would sell for at Baltimore, and what the damaged bale did bring, to take that proportion and apply it to the value in the invoice; for which only the insurer was liable: thus, if the bale was valued in the invoice at 100 dollars, and being sold sound at Baltimore would have brought 200 dollars, but damaged fetched only 100; the difference between sound and unsound at the port of delivery was one-half, or in other words, a loss of half the value. This applied to the invoice in the like proportion, would make the insurer liable on his own subscription, to half the invoice value. viz. 50 dollars on a

bale, and on the whole fifteen 750 dollars; whereas, taking the difference in money between the sound and unsound bales at the market, the loss would be 1500 dollars. This, he stated as the rule laid down in Lewis v. Rucker, 2 Burrows, 1167, and was the settled mode of adjusting average losses.

The fact was, that the plaintiff did not, on the trial, produce the invoice, or prove the prime cost of the goods, nor was any account given of it. Rawle therefore contended, that the jury ought not to take as the loss, the difference between what the sound and unsound bales sold for at Baltimore, and charge the defendant in that ratio on his subscription; because that rule might involve the underwriter in the state of the market, with which he had nothing to do, except so far as to indemnify the insured in the proportion which the loss bore to the estimated value in the policy. Now, as the plaintiff has not produced the original invoice, or insured value, the jury cannot take the proportion between the sound and the unsound cotton at Baltimore, say. a fifth, a sixth, or a seventh, and apply it to the value in the policy, and charge an average of a fifth, sixth or seventh on that value; but will be obliged to take the absolute difference in money at the port of delivery, and charge it to the underwriter, which as is shown in Lewis v. Rucker, [supra,] is a most uncertain and unjust rule. In short, he contended that the plaintiff could not recover.

THE COURT, in charging the jury on this point, gave no decided opinion; but merely stated that though this was the proper rule, and easily applied in the case of Lewis v Rucker, because there, each hogshead was separately valued in the policy, yet, as here the whole cargo was valued together, it was impossible, from the face of the policy, to come at the proportion of loss, which each bale bore to the value insured. That to be sure, there must be an invoice, and no doubt a value affixed to each bale; but as this was a cargo valued in lump in the policy at Providence, it was not certain that the invoice value at India, was the one meant to be referred to in case of an average loss; neither did the court, as at present, consider the non-production of the India invoice, as depriving the plaintiff of his right to recover. That the jury had in proof the difference between the sound and unsound bales at the port of delivery; and unless the defendant could show a better rule, the jury might adopt that, or such other as would do justice.

2d. The insurance was at and from Providence in Rhode Island, to Baltimore in Maryland. From the protest of the captain, and other evidence, it appeared, that he sailed from Providence on the voyage, on the 28th July, and touched at Newport, where he remained several days, and then proceeded; after which, and between Newport and Baltimore, the damage happened. It did not

appear why the captain put into Newport, and remained there so long. But several witnesses had been examined on commission, who proved, that going into Newport and remaining there, either to take in lading, or on account of being wind bound, or to procure lading, was considered as in the course of the voyage; and it was the general custom, and so understood, that going to Newport was in the course of the voyage, and no deviation.

Rawle contended, that it did not appear for what cause the captain went to Newport; that he remained there eleven days; that none of the witnesses, except one, had said that going into Newport was discretionary and without some cause, and might be without limitation of time. There was here, then, a plain deviation. and that destroys the insurance. That the usage must be general, well known and defined; Park, Ins. 308; and that this departure was not supported by the usage. Park, Ins. 300, 302.

THE COURT, on this part of the case, told the jury, that several witnesses had sworn that touching and staying at Newport was within the course of the voyage, and so understood by underwriters. Whether the right of going there was restricted to particular causes; whether any such cause existed in this case; whether the captain remained there an unreasonable time beyond the customary allowance; and generally, whether the going there and remaining, were within the custom of the trade, were matters of fact. If they found the deviation within the custom and usage, then it would not affect the policy: but if otherwise, then the policy would be avoided, and the insurers discharged.

3d. But the great question which arose in this cause and very much litigated, was, whether the insured could recover for an average loss, on account of damage by the sea to the goods in question, without proof on the part of the assured, that the captain had caused a survey to be made at the port of delivery, before breaking bulk. It was urged by the defendant's counsel, that the underwriters were not answerable, if the damage arose from bad stowage, or insufficient dunnage, or other unworthiness of the ship, or from the carelessness of the mariners. That it was an indisputable rule that the insured could not recover for losses arising from his own act, or the act of his agents, except for barratry. 1 Emerig. Ins. 364, 678, 680. That as damage by sea water, might arise either from the natural perils of the sea, or from the bad stowage, &c. of the cargo, a custom had been established, by which it was necessary for the captain before bulk broke, to call in two or more surveyors. being experienced persons, usually captains of vessels, to examine the condition of the ship, and after making a survey, to certify whether the stowage and dunnage had been good, or if any damage appeared,

to what cause it was owing. They contended that this custom existed in Baltimore, and that as no survey had been made, the insured could not recover. They cited on usages, Park, Ins. 30, 33, 40, 41, 44, 45, 115, 116, 308; 1 Beaw. Lex. Merc. 75; 2 Emerig. Ins. 100, 103; 2 Burrows, 1226; 1 W. Bl. 417.

In order to establish the custom, a great many witnesses swore, that it was the settled and undoubted usage in Baltimore, for the captain to have a survey made previous to unlading; and that according to the received opinion and practice at the insurance offices, and among insurers and insured at Baltimore, insurance for average loss was never paid, nor considered as recoverable, unless a survey had been made by the captain, and was produced as a document against the underwriters. A number of witnesses, and among others, certain ancient and established insurance brokers of Philadelphia, were examined, who proved the same usage and opinion in Philadelphia. It further appeared, that under the colonial government, and since, under the federal government, the court of admiralty in Philadelphia had constantly issued commissions of survey for that port; and the act of congress, (2 Stat. 109,) was cited, authorizing such commissions. In Baltimore, it appeared the practice was, for the captain to procure the survey to be made, and by persons of his own choosing.

On the other hand, many respectable witnesses, merchants, brokers, and others, and particularly the presidents of two insurance companies in Baltimore, were examined by commission on this point. They agreed that there was a practice in that port such as before described, and, that in cases of average loss, the survey was one of the usual documents called for at the offices, in order to charge the underwriter. But they said, that in their opinion, there was no custom or usage which deprived the insured from recovering for a loss of that kind, if it could be otherwise well proved, merely because of an omission in the captain to make a survey before bulk broke. That a survey made was generally a good piece of evidence for the insured, as it was used to prove that the damage arose not from the ship, but from the seas; and so made less proof or none necessary to show that loss had happened by the perils of the sea. Yet it was always their understanding, that if the insured could otherwise sufficiently prove the damage to have happened by the causes insured against, the want of a survey was no legal bar to their recovery.

On the part of the plaintiff it was contended that such an usage was unreasonable; that the insured, in the relation they stood to the underwriter in case of goods freighted, had nothing to do with the captain or ship owner; all they had to do was to prove the loss or damage insured against:

if the captain omitted a survey it was nothing to them; and that there was no such general law of insurance as that now set up, (Park, Ins. 112;) that such port customs as these, were not of general notoriety; the underwriter in Philadelphia could have no view to it, even if it existed; and that in fact it seemed no more than a regulation which took place at the offices in adjusting the evidence of losses, and not a custom adopted by any judicial authority. But admitting such a custom might exist to destroy the remedy of the insured, yet, that it was not proved; on the contrary, the evidence, to say no more of it, left it in equilibrio.

THE COURT, in charging the jury, said, that by the general law, a survey, though to many purposes a very useful and proper document, even as between insurer and insured, was not an essential piece of evidence to make out the title of the insured to his indemnity. If he could satisfactorily prove the loss or damage without, that would be sufficient. The question made here, is, whether, by the usage of the place, and established custom, the production of this instrument, as between insurer and insured, is not essential to the plaintiff's recovery on the policy in question. A custom which is to control or model the rules of evidence necessary to establish a title or claim in a court of justice, to something different from the common or general law, may, possibly, be good; we do not now determine that. But it must be observed, that there is something very harsh in a custom or usage which would not admit of those exceptions to the rule, which necessity or accident would allow of according to the common law. What if a survey should be lost, or the captain should, by death or accident, be rendered incapable of making it? But be that as it may, in order to give to such usage the force contended for, against the insured in this instance, it ought to be clearly made out; its existence, its extent, and its notoriety, should be indisputable. If this had been proved, a case might be raised whether this usage did not make part of the contract, and as it were embodied with it by an implied understanding of the parties, who are always supposed to be privy to, and bound by those general usages which belong to the trade on which, the policy is made, though not enumerated in the policy. But the usage contended for, namely, that the neglect, omission or refusal of the master to make a survey, bars the insured from recovering his average loss, though he can otherwise sufficiently prove it, is not established by the testimony. The witnesses differ; and upon the whole there is not, in point of fact, any such usage proved. If you are of this opinion, you will pay no respect to the usage as a bar. Still, however, the insured must prove to your satisfaction, that the loss did happen by the perils of the sea, and not from mismanagement in the stowage or dunnage.

Of this, much evidence is laid before you; and on this point the want of a survey which might have proved the damage not to have arisen from the stowage or dunnage, is some evidence of a negative kind, that the damage did arise from that cause; and in this point of view only you are to consider it, and not as a bar.

The jury found for the plaintiff.